```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
LIU BO SHAN,                            :
                 Plaintiff,             :     09 Civ. 8566 (DLC)
                                        :
            -v-                         :     OPINION & ORDER
                                        :
CHINA CONSTRUCTION BANK CORP.,          :
                                        :
                 Defendant.             :
                                        :
----------------------------------------X
```

APPEARANCES:

For Plaintiff:
Terrence Collingsworth
Conrad & Scherer, LLP
1156 15th Street NW, Suite 502
Washington, DC 20005

Meryl Sanders Viener
Sanders Viener Grossman LLP
100 Herricks Road
Mineola, NY 11501

For Defendant:
James B. Weidner
Todd A. Spiegelman
Alejandra de Urioste
Clifford Chance U.S. LLP
31 West 52nd Street
New York, NY 10019

Juan P. Morillo
Stephen M. Nickelsburg
Clifford Chance U.S. LLP
2001 K Street NW
Washington, DC 20006

DENISE COTE, District Judge:

    Chinese national Liu Bo Shan (the "plaintiff") has sued his

former employer, China Construction Bank Corp. (the "Bank"),

alleging torture, prolonged arbitrary detention, and cruel, inhumane and degrading treatment or punishment in violation of customary international law.  Plaintiff brings these claims pursuant to the the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"),[1] and the Torture Victim Protection Act, 28 U.S.C. § 1350 note ("TVPA").  On March 19, 2010, the Bank moved to dismiss plaintiff's amended complaint.  For the following reasons, the Bank's motion is granted.

BACKGROUND

The following facts, taken from the plaintiff's March 5, 2010 amended complaint (the "Complaint"), are assumed to be true in deciding this motion.  Plaintiff was employed by the Bank at its office in Hongling, China as a manager and loan department clerk between 1988 and 1993.[2]  At the time, the Bank was wholly government-owned and controlled.  Today, however, the Bank is a privately held corporation headquartered in Beijing, China.[3]

---

[1] The ATS is also referred to as the Alien Tort Claims Act ("ATCA").

[2] The Complaint alleges that the Bank was "[f]ounded in 1994 as a Chinese government-owned bank."  Because the Complaint also alleges that plaintiff was employed at the Bank from 1988 to 1993, the allegation concerning the 1994 date will be disregarded for the purposes of resolving this motion.

[3] According to the Complaint, the Bank maintains 14,000 branches in China as well as overseas branches in New York, Hong Kong, Singapore, Frankfurt, Johannesburg, Seoul, and Tokyo.  The Complaint alleges that the Bank "did not become an independent

2

In September 1993, plaintiff was assigned to audit a loan discrepancy. During the audit, plaintiff discovered that the Bank had issued false bank deposit certificates. Plaintiff then prepared a report disclosing the results of his audit and submitted it to the Bank's Audit Director.

Thereafter, in order to punish plaintiff for "exposing illegal banking practices" and/or "to intimidate and coerce Plaintiff from exposing the Bank's illegal practices to the general public," the Bank terminated his employment.[4] Additionally, the Bank accused plaintiff of violating Bank policy by consorting with a prostitute. The Bank contacted the police and sought to have plaintiff arrested on charges that he had paid a prostitute to engage in sexual acts on Bank property. To support this allegation, the Bank compelled three of its employees to provide false statements to the police. As a result of the Bank's accusation and the three employees' statements, plaintiff was arrested on November 13, 1993.

---

commercial bank until 2004, when it was deliberately restructured as a shareholding bank with private investors, including the Bank of America."

[4] The Complaint is not consistent in describing why the Bank fired plaintiff and reported him to the police. Nevertheless, whether the Bank was acting in retaliation for the plaintiff submitting his report to the Audit Director, in order to prevent the plaintiff from releasing the audit publicly, or both, does not materially affect the analysis of the Bank's liability herein.

Plaintiff alleges that, after he was arrested, he was tortured and subjected to cruel treatment by the police. Plaintiff's wrists were shackled together and he was suspended by his wrists, beaten, and slapped. His trousers were removed and his genitals were burned and mutilated by lit cigarettes. Plaintiff was confined in a small cell, where five buckets of water were thrown on him. The water remained in the cell at a depth of several inches, causing his feet to swell and affording plaintiff no place to sit or lie down. After two days in these conditions, plaintiff was forced to sign a confession.

On November 15, 1993, plaintiff was formally charged with a crime and then sentenced to 15 days' imprisonment and a fine of RMB 5,000.[5] Plaintiff paid the fine and was held for eleven days through November 26, 1993. Despite a recantation by one of the three Bank employees who had given a statement to the police,[6] and despite an admission by the Bank's Vice President that he was responsible for issuing the false deposit certificates discovered by plaintiff, the Bank refused to investigate the

---

[5] Plaintiff represents that the crime with which he was charged is enumerated in "article 32 of the People's Republic of China Public Security Punishment Regulation."

[6] The recanting employee admitted to lying to the police and stated that, in fact, plaintiff had not engaged in sexual activity with any woman on Bank property. The employee indicated that the Bank forced him to provide false information about plaintiff by threatening him with arrest or revocation of his travel documents (his "Frontier In-Out Permit").

4

circumstances surrounding his firing and instead "adhered to the false charge" against him.

Plaintiff thereafter left China, and was granted political asylum in the United States in 1997. He is now a United States permanent resident.

PROCEDURAL HISTORY

On October 8, 2009, the plaintiff filed this lawsuit pursuant to the ATS and TVPA, alleging violations of customary international law by the Bank. The Bank moved to dismiss this action on December 1, 2009. In opposition, the plaintiff requested leave to amend in the event that his complaint was determined to be insufficient. By Order of February 3, 2010, plaintiff was granted leave to amend.

Plaintiff submitted his amended complaint on March 5, 2010. On March 19, the Bank moved to dismiss the amended complaint. Plaintiff filed his opposition on April 9, and the Bank filed its reply on April 16.

DISCUSSION

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" Ashcroft v. Iqbal, 556 U.S. __, 129 S. Ct. 1937, 1949 (2009). This rule "does not require 'detailed factual allegations,'" id. (quoting Bell Atl.

5

Corp. v. Twombly, 550 U.S. 544, 555 (2007)), but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  Id. (quoting Twombly, 550 U.S. at 555); see also id. ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

A trial court considering a Rule 12(b)(6) motion "accepts all well-pleaded allegations in the complaint as true, drawing all reasonable inferences in the plaintiff's favor."  Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010).  To survive dismissal, "a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'"  Id. (quoting Twombly, 550 U.S. at 555).  In other words, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. at 1949.  Applying the plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. at 1950.

The Complaint enumerates four causes of action: torture

under the TVPA; torture under the ATS; cruel, inhumane, or degrading treatment or punishment ("cruel treatment") under the ATS; and prolonged arbitrary detention under the ATS.[7]  The Bank contests the sufficiency of the Complaint on three principal grounds: (1) failure to file suit within the applicable statute of limitations; (2) failure to plead an adequate basis for the Bank's liability; and (3) failure to state a claim as to each individual count.  For the purposes of this motion, the Court assumes without deciding that plaintiff's suit is not barred by the statute of limitations.[8]

---

[7] Plaintiff alleges that the Bank violated the following laws, agreements, conventions, and resolutions, which he contends are indicative of customary international law with respect to his four claims: the ATS, the TVPA, U.S. common law, the United Nations Charter, the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, the Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, and the Vienna Declaration and Programme of Action from the 1993 World Conference on Human Rights.

[8] The TVPA provides that "[n]o action shall be maintained under this section unless it is commenced within 10 years after the cause of action arose."  28 U.S.C. § 1350 note, § 2(c).  The ATS does not contain a statute of limitations, however, courts have held that the TVPA, which is appended to the ATS, provides the applicable limitations period.  See, e.g., In re S. Afr. Apartheid Litig., 617 F. Supp. 2d 228, 288 (S.D.N.Y. 2009).  The parties agree that all four of plaintiff's claims are governed by a ten-year limitations period.  The parties disagree, however, regarding when the ten-year period began to run and whether plaintiff is entitled to equitable tolling.  Because this Opinion rests on other grounds, it need not be decided whether equitable tolling is applicable.

I.  Substantive Standards

A.  Alien Tort Statute

The ATS, originally enacted in 1789, currently provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The Second Circuit has described "three elements required to state a claim under the ATS: plaintiffs must (i) be 'aliens,' (ii) claiming damages for a 'tort only,' (iii) resulting from a violation 'of the law of nations' or of 'a treaty of the United States.'"  Presbyterian Church of Sudan v. Talisman Energy, Inc., 582 F.3d 244, 255 (2d Cir. 2009) ("Talisman") (citation omitted).  The ATS is a jurisdictional statute,[9] and "'[its] jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability'" at the time of its enactment.  Id. (quoting Sosa v. Alvarez-Machain, 542 U.S. 692, 724 (2004)).

"Claims 'based on the present-day law of nations' should be recognized only if 'accepted by the civilized world and defined

---

[9] The Bank correctly observes that a motion to dismiss the plaintiff's ATS claims may be made as a Rule 12(b)(1) motion for lack of subject matter jurisdiction.

8

with a specificity comparable to the features of the 18th-century paradigms' contemporary with the enactment of the ATS." Id. (quoting Sosa, 542 U.S. at 725); see also Abdullahi v. Pfizer, Inc., 562 F.3d 163, 176 (2d Cir. 2009). In resolving "the question of whether a particular customary international law norm is sufficiently specific, universal, and obligatory to permit the recognition of a cause of action under the ATS," courts must "examine how the specificity of the norm compares with 18th-century paradigms, whether the norm is accepted in the world community, and whether States universally abide by the norm out of a sense of mutual concern." Abdullahi, 562 F.3d at 176.

For a private individual or entity to be held liable for a violation of customary international law under the ATS, a defendant must have "'acted in concert with' the state, i.e., 'under color of law.'" Id. at 188 (citation omitted).[10] By

---

[10] In its motion to dismiss, the Bank argues that corporations cannot be held liable under the ATS or TVPA for violations of customary international law. The Second Circuit has repeatedly assumed without deciding that corporations are proper defendants under the ATS. See Talisman, 582 F.3d at 261 n.12; Flores v. S. Peru Copper Corp., 414 F.3d 233, 254-55 (2d Cir. 2003) (reaching the issue of whether intranational pollution violates customary international law in suit against a corporation); Abdullahi, 562 F.3d at 188-89 (holding that the plaintiff sufficiently stated an ATS claim against a corporation for nonconsensual medical experimentation); see also Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 319 (S.D.N.Y. 2003) ("[S]ubstantial U.S. and international precedent indicates that corporations may be responsible, in certain cases, for

analogy to the governing standards under 42 U.S.C. § 1983, "state action may be found [under the ATS] when 'there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.'"  Id. (quoting Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001)).  That nexus may exist "where a private actor has operated as a willful participant in joint activity with the State or its agents, or acts together with state officials or with significant state aid."  Id.  (citation omitted).

    B.    Torture Victim Protection Act

The TVPA, enacted in 1992, "creates a cause of action for damages against any 'individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture.'"  Arar v. Ashcroft, 585 F.3d 559, 567 (2d Cir. 2009) (en banc) (quoting 28 U.S.C. § 1350, note § 2(a)(1)).  The TVPA "establishes an unambiguous and modern basis for federal claims of torture and extrajudicial killing."  Sosa, 542 U.S. at 728 (citation omitted); see also Flores, 414 F.3d at 246-47 (discussing the origins and legislative history

---

violations of international law.  In this case, where plaintiffs allege jus cogens violations, corporate liability may follow."). The Second Circuit has recently requested briefing on the issue in connection with Balintulo v. Daimler AG, No. 09-2778-cv, Order at 1-2 (2d Cir. Dec. 4, 2009).  This argument need not be addressed, however, as this motion is resolved on other grounds.

of the TVPA).

As with the ATS, "[a]ny allegation arising under the TVPA requires a demonstration that the defendants acted under color of foreign law, or under its authority."  Arar, 585 F.3d at 568. "For purposes of the TVPA, an individual 'acts under color of law . . . when he acts together with state officials or with significant state aid.'"  Khulumani v. Barclay Nat'l Bank Ltd., 504 F.3d 254, 260 (2d Cir. 2007) (quoting Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir. 1995)).

## II.  Theories of Liability

In seeking to hold the Bank liable for his injuries, the plaintiff asserts three alternative theories of the Bank's participation.  First, plaintiff alleges that the Bank may be held directly liable as a principal.  Second, the plaintiff argues that the Bank is liable as an aider-and-abettor of the Chinese police.  Third, the plaintiff alleges that the Bank was a co-conspirator of the Chinese police.  Each theory is addressed in turn below.

### A.  Direct Liability

Plaintiff first asserts that the Bank is directly liable for the alleged violations of customary international law committed against him.  Plaintiff alleges that, in 1993, "the Bank was an integral part of the Government of China," "under

11

the control of the Communist party," and "operating as an arm of the State." Plaintiff therefore asserts that, "[w]hen the Bank's officers and employees caused Plaintiff to be taken to prison and tortured and detained, they were acting under the color of authority of the Government of China."

The plaintiff has failed to allege direct liability by the Bank for the claims upon which plaintiff has sued. Under international law, "[c]ommitting a crime covers physically perpetrating a crime or engendering a culpable omission in violation of criminal law. . . . The actus reus required for committing a crime is that the accused participated, physically or otherwise directly, in the material elements of a crime . . . whether indirectly or jointly with others." Prosecutor v. Limaj, Case No. IT-03-66-T, Judgment, ¶ 509 (Nov. 30, 2005) (citation omitted), aff'd, IT-03-66-A (Sept. 27, 2007); see also Talisman, 582 F.3d at 259 (clarifying that standards of liability applicable to ATS claims are taken from international, not domestic, law); id. at 257 n.7 (looking to international criminal law because many customary international law norms "have been developed largely in the context of criminal prosecutions rather than civil proceedings" (citation omitted)).

Plaintiff has not alleged that any Bank employee or official physically tortured plaintiff, caused him to suffer cruel treatment, or subjected to him to prolonged arbitrary

detention.  Nor does plaintiff allege that the Bank planned, instigated, ordered, solicited, or induced the police to subject him to any of those wrongful acts.  Cf. Statute of the International Tribunal for the Former Yugoslavia, art. 7, May 25, 1993, U.N. Doc. S/RES/827 ("A person who planned, instigated, ordered, committed or otherwise aided and abetted in the planning, preparation or execution of a crime . . . shall be individually responsible for the crime."); Rome Statute of the International Criminal Court, art. 25, July 17, 1998, 2187 U.N.T.S. 90 ("[A] person shall be criminally responsible and liable for punishment for a crime within the jurisdiction of the Court if that person: [c]ommits such a crime . . . [or] [o]rders, solicits or induces the commission of such a crime . . . .").

Plaintiff's failure to state a plausible theory of direct liability is made apparent by various admissions he makes in the Complaint and in opposition to the Bank's motion to dismiss.  In the Complaint, the plaintiff distinguishes "the acts of the Bank in causing Plaintiff to be arrested by the government police" from "the acts of the government police who directly inflicted the unlawful treatment."  In opposition to the motion to dismiss, the plaintiff again acknowledges that it was "the Chinese police who tortured Plaintiff."[11]  To the extent that the

---

[11] The Complaint begins by stating that plaintiff "brings this action for the torture inflicted upon him by his former

13

plaintiff describes the Bank's own conduct, he refers only to the Bank's providing "false evidence" to the police.  Providing the police with the false evidence that led to plaintiff's arrest is a separate act from inflicting torture, cruel treatment, or prolonged detention.  Because, as plaintiff admits, "the acts of torture were committed by the Chinese government police," the Bank is not directly liable for plaintiff's mistreatment.

To save his theory of direct liability, plaintiff appears to contend that the Bank is liable because the Bank and the police were both part of the same national government.  Plaintiff asserts that "China was unique in the world for its treatment of major banks like [the Bank] as an integral part of the government."

Plaintiff's argument is without merit.  Although the Bank and the police may have been part of the same government, the Bank may not be held directly liable for the acts of the police.  "'[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign [and, presumably, from one another] should normally be treated as such.'"  EM Ltd. v. Republic of Argentina, 473 F.3d 463, 476 (2d

---

employer."  The remainder of the Complaint as well as plaintiff's submissions in opposition to defendant's motion to dismiss, however, reflect that the Bank did not physically torture the plaintiff.

Cir. 2007) (quoting <u>First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba</u>, 462 U.S. 611, 626-27 (1983)); <u>see also</u> <u>First City, Texas-Houston, N.A. v. Rafidain Bank</u>, 150 F.3d 172, 176 (2d Cir. 1998) (discussing the relationship between a central banking authority and a state-owned commercial bank and noting that "foreign entities are presumed to be separate" from one another). Although this "presumption of separateness" may be overcome by a factual showing that one government entity was "so extensively controlled by [another] that a relationship of principal and agent is created," <u>EM Ltd.</u>, 473 F.3d at 477 (citation omitted), the plaintiff has failed to allege any facts that would permit an inference that the Chinese police effectively controlled the Bank, or vice versa. The fact that the Bank has since become, at least in part, a privately held entity -- a circumstance that the plaintiff readily acknowledges -- only serves to underscore the fact that the Bank and the police were separate juridical entities.[12]

  B. Aiding and Abetting

  Plaintiff's second theory of liability is that the Bank may

---

[12] The Bank argues that if it is found to have been an "integral part" of the Chinese government, then sovereign immunity would apply. Plaintiff responds that the issue of sovereign immunity is determined based on the governmental status of a commercial entity at the time the complaint was filed. The issue of sovereign immunity need not be addressed, however, because the plaintiff's claims fail on other grounds.

be held liable as an aider-and-abettor to the Chinese police.[13] "[I]n this Circuit, a plaintiff may plead a theory of aiding and abetting liability under the ATS." Talisman, 582 F.3d at 258 (citation omitted). "[A] defendant may be held liable under international law for aiding and abetting the violation of that law by another when the defendant (1) provides practical assistance to the principal which has a substantial effect on the perpetration of the crime, and (2) does so with the purpose of facilitating the commission of that crime." Id. at 259 (citation omitted). Although "knowledge alone" does not suffice in order for liability to attach, id., intent or purpose "must often be demonstrated by the circumstances." Id. at 264.

In support of his aiding-and-abetting theory, plaintiff alleges that "the Bank officers and employees . . . acted to aid and abet the government police by acting jointly with the police to injure Plaintiff because he exposed fraud of high level officials of the Government of China." Plaintiff alleges that the Bank officers and employees "provided the police with the false information necessary to allow them to torture, detain and abuse the Plaintiff." The plaintiff further asserts that "the Bank knew or was substantially certain that by contacting the

---

[13] In his opposition to this motion, the plaintiff appears to abandon his aiding-and-abetting and conspiracy theories of liability. Because plaintiff's preferred theory -- direct liability -- does not survive, however, plaintiff's alternative theories of liability will be addressed as well.

police [the plaintiff] would be tortured and otherwise subjected to cruel and degrading treatment which detainees routinely suffer at the hands of such officials."

Plaintiff has failed to allege a plausible basis for aiding-and-abetting liability. By alleging only that the Bank "knew or was substantially certain" that he would suffer torture or cruel treatment at the hands of the police, the plaintiff has failed to allege the requisite mens rea standard for aiding-and-abetting liability under Talisman. The plaintiff has failed to allege any facts that would allow a court to draw a plausible inference that the Bank acted with the intent or purpose to have the police torture the plaintiff or otherwise to violate international law. At best, the plaintiff has pleaded that the Bank acted with the intent to punish plaintiff for releasing his audit report, or to prevent the plaintiff from further disseminating the report.

The plaintiff's aiding-and-abetting claim also fails because he has not alleged conduct that would constitute "practical assistance to the principal which has a substantial effect on the perpetration of the crime." Talisman, 582 F.3d at 259 (citation omitted). "[P]articipation in a crime is substantial if 'the criminal act most probably would not have occurred in the same way had not someone acted in the role that the accused in fact assumed.'" Talisman, 244 F. Supp. 2d at 324

17

(quoting Prosecutor v. Tadic, Case No. IT-94-1-T, Opinion and Judgment, ¶ 688 (May 7, 1997)).  Here, the plaintiff has alleged, at most, that the Bank intentionally provided false evidence to the police.  The plaintiff has not explained, however, how the act of making a false report concerning the commission of a crime constitutes substantial assistance to torture, cruel treatment, or prolonged arbitrary detention.

    C.    Conspiracy

Finally, plaintiff alleges that the Bank was a co-conspirator of the Chinese police.  He asserts that the "police were acting as agents of the Bank in participating in a scheme to prevent Plaintiff from exposing the fraud of high level Bank officials."  Specifically, plaintiff alleges that he was warned by a supervisor at the Bank not to expose the fraud, and "[w]hen he did not heed that warning . . . the police officers who injured him expressly told him that he should not have released his audit."  The plaintiff implies that that statement by the police is indicative of a common plot to subject him to torture, cruel treatment, and arbitrary detention.

"The analog to a conspiracy as a completed offense in international law is the concept of a 'joint criminal enterprise.'"  Talisman, 582 F.3d at 260 (citing Hamdan v. Rumsfeld, 548 U.S. 557, 611 n.40 (2006)).  Under international

law, "an essential element of a joint criminal enterprise is 'a criminal intention to participate in a common criminal design.'" Talisman, 582 F.3d at 260 (quoting Prosecutor v. Tadic, Case No. IT-94-1-A, Appeal Judgment, ¶ 206 (July 15, 1999)). Courts require "the same proof of mens rea" for a theory of conspiratorial liability as for claims of aiding and abetting. Talisman, 582 F.3d at 260.

Plaintiff has failed to state a plausible theory of conspiratorial liability. Just as he has failed to allege that the Bank acted with the intent or purpose to aid and abet the Chinese police, the plaintiff has not alleged the requisite mens rea for holding the Bank liable as a co-conspirator. Even if the police knew about the audit that the plaintiff conducted for the Bank, that is an insufficient basis to infer that a plot existed between the Bank and police to subject plaintiff to torture, cruel treatment, and prolonged arbitrary detention.

## CONCLUSION

China Construction Bank Corp.'s March 19, 2010 motion to dismiss is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated:   New York, New York
         June 28, 2010

*[signature]*
DENISE COTE
United States District Judge